## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **WARREN LEE BROGGIN, JR.,** | ) | |
| Plaintiff, | ) | Case No. 7:21-cv-00180 |
| | ) | |
| **v.** | ) | |
| | ) | By: Michael F. Urbanski |
| **BRRJA, et al.,** | ) | Chief United States District Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION

Warren Lee Broggin, Jr., a federal pretrial detainee proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. At the time of the events alleged in the complaint, Broggin was incarcerated at the Lynchburg Adult Detention Center, a facility operated by the Blue Ridge Regional Jail Authority ("BRRJA"). Broggin asserts, among other claims, that his conditions of confinement during the COVID-19 pandemic violated his constitutional rights and that he was placed in segregation in retaliation for voicing complaints related to COVID-19. Defendants BRRJA, Joshua Salmon, Major Enochs,[1] and Nurse Jones have filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which been fully briefed by the parties. For the reasons set forth below, the motion to dismiss, ECF No. 27, is **GRANTED IN PART AND DENIED IN PART**.

### I.    Factual Background

The following summary of the facts is taken from the complaint and its accompanying exhibits. The facts are presented in the light most favorable to Broggin. See McCaffrey v.

---

[1] Enochs is incorrectly identified in the complaint as "Major Enoch." The Clerk will be directed to correct the spelling of this defendant's last name.

Chapman, 921 F.3d 159, 163–64 (4th Cir. 2019) ("In considering a motion to dismiss under Rule 12(b)(6), a court 'accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff . . . .'") (quoting Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009)).

On October 23, 2020, Broggin was arrested on a federal indictment and transported to the Lynchburg Adult Detention Center ("LADC"). Compl., ECF No. 1, at ¶ 12. Two days later, "after being seen by medical and completing classification, [Broggin] was placed in Unit L to begin the 14 day process of quarantine even though [he] had no known or documented symptoms of . . . COVID-19." Id. ¶ 12. After completing the quarantine period, Broggin was "classified to Unit G housing," which he describes as "a low custody level open dorm with over 40 beds" that often holds "upwards of 70 inmates." Id. ¶ 13.

On December 23, 2020, private medical contractors conducted COVID-19 testing in Unit G. Id. ¶ 14. Thirty-seven inmates and four staff members tested positive for the virus. Id. Two of the positive inmates were immediately removed from the housing unit. Id.

Based on the test results, Broggin and other inmates in Unit G feared for their safety. Id. ¶ 16. Broggin alleges that the "only options inmates had to combat the life threatening viral infection" were diluted pine cleaner, window cleaner, and Barbicide disinfectant, along with homemade nylon masks. Id. ¶ 18. He alleges that staff members wore paper masks and that they cleaned the housing unit with "10% bleach (diluted bleach) . . . several times a week." Id. ¶¶ 22, 24. Additionally, rather than forcing staff members to undergo an "instant swab" when they reported to work, "administrators only used an infrared thermometer" to take staff members' temperatures at the beginning of each shift Id. ¶¶ 38, 40.

2

Broggin's complaint indicates that the BRRJA restricted certain activities as a result of the pandemic. For instance, in-person visitation was suspended in November 2020, and inmates were required to visit family members using an electronic tablet. Id. ¶ 56. Additionally, inmates were "allowed to only use the tablet to access law library [materials]." Id. ¶ 57.

On December 31, 2020, a Lynchburg newspaper reported on the "[w]ave of COVID-19 cases" at area jails. Compl. Ex. D, ECF No. 1-1 at 5. According to the article, Joshua Salmon, the Administrator of the BRRJA, reported that 37 inmates at the LADC had recently tested positive for COVID-19. Id. Broggin alleges that hundreds of inmates tested positive after the newspaper article was published. Compl. ¶ 28; see also id. ¶ 37 (alleging that the LADC had over 400 positive inmates "30 days after Mr. Salmon did the interview").

On January 22, 2021, Nurse Jones and other members of the LADC's medical staff tested each inmate in Unit G for COVID-19. Id. ¶ 60. Twenty-four inmates, including Broggin, tested positive for the virus. Id. ¶¶ 60–61, 66. "The other inmates who were not positive were classified to another unit." Id. ¶ 60. The remaining inmates in Unit G were "simply told they were on quarantine" and instructed to "submit request forms for all [medical] issues." Id. ¶ 61.

"Days prior to the positive results," Broggin advised nurses that he was experiencing headaches. Id. ¶ 62. Nurses checked his blood pressure and found it to be elevated in one arm. Id. The following day, Broggin was placed on blood pressure medication. Id. ¶ 63. Although headaches are a possible symptom of COVID-19, Broggin was not tested for the virus at that time. Id.

On January 30, 2021, a correctional officer advised the inmates in Unit G that 27 newly-infected inmates from Unit E were going to be moved to Unit G. Id. ¶ 64. By that time, Broggin and the other inmates in Unit G had been quarantined for nine days. Id. ¶ 66. A bond hearing in Broggin's case had been cancelled because of his need to quarantine, and he did not want to contract the virus again from the newly-infected inmates or have his quarantine period extended. Id. When Broggin complained to a correctional officer about the decision, the officer advised Broggin that he had already explained to Major Enochs that mixing inmates from the two units was a bad idea. Id. ¶ 69. According to Booth, Major Enochs "would not change his mind" and appeared to believe that "his rank was being tested." Id. Minutes later, officers shared Broggin's concerns and those of other inmates with Major Enochs. Id. ¶ 70.

 Later that evening, officers entered Unit G and called for the seven inmates, including Broggin, "who refused to allow the infected inmates to be in the same unit." Id. ¶ 72. Broggin subsequently spoke to Major Enochs and "explained why he didn't want infected inmates to enter the unit." Id. In response, Major Enochs "smirked and said[,] 'get him out of my face.'" Id. ¶ 73. Broggin was immediately moved to Unit M, a maximum-security unit, and "placed . . . on 'administrative segregation' in his cell." Id. ¶ 74.

While in segregation, Broggin "could not use the phone to advise family of his current situation or use the electronic tablet to fill out requests" for video visitation, library resources, or grievance forms. Id. ¶ 75. He was only allowed to leave his cell twice a week for fifteen minutes to take a shower and clean his cell, and he was denied access to any outdoor exercise or recreation opportunities. Id. ¶¶ 76–77, 89. Although the cell was "filthy" when Broggin initially arrived, he had to wait 48 hours before he was allowed to clean it with "diluted pine

4

cleaner." Id. ¶ 78. Additionally, Broggin was given only half of a roll of toilet paper to use from January 30, 2021 to February 4, 2021, and he was denied medication on multiple occasions. Id. ¶ 79. When Broggin asked officers "why he was in admin[istrative] seg[regation] being punished for nothing," he was "always" told that he "pissed the major off." Id. ¶ 80.

As of February 15, 2021, Broggin "had still never received a charge" or "any formal process" despite being held in segregation. Id. ¶¶ 99, 103. He remained in segregation for nineteen days before being released to Unit M with other inmates. Id. ¶ 106; see also id. ¶ 113 ("No process was conducted and plaintiff remained in M Unit with very restricted options for 19 days.").

While in segregation, Broggin missed a bond hearing and a hearing to contest the forfeiture of a vehicle. Id. ¶ 92. Broggin alleges that his inability to appear for those hearings "put a lot of stress" on him and his family, as did his inability to contact them by telephone or video. Id. ¶¶ 92–93. He further alleges that he had "thoughts of suicide a couple of times" while being "forced to endure harsh conditions." Id. ¶ 92.

Broggin submitted several exhibits with his complaint, including documents related to his efforts to exhaust his administrative remedies. The exhibits reveal that Broggin filed an inmate request and a grievance asserting that he was being held in administrative segregation without receiving due process. See Compl. Exs. A. and B, ECF No. 1-1. Broggin alleged that he was "being disciplined" after he "refused to be housed" with newly-infected inmates in Unit G and "asked to be removed to finish [his] quarantine." Compl. Ex. A, ECF No. 1-1 at 1. In response to Broggin's administrative submissions, Major Enochs denied that Broggin

was being disciplined and asserted that the "transfer was at [Broggin's] request."[2] Compl. Ex. B, ECF No. 1-1 at 3.

## II.   Procedural History

On March 29, 2021, Broggin filed this action under 42 U.S.C. § 1983 against the BRRJA, Salmon, Major Enochs, and Nurse Jones. ECF No. 1. Broggin's complaint, liberally construed, asserts several claims for violations of his rights under the Due Process Clause of the Fourteenth Amendment, including claims based on the conditions of confinement during the COVID-19 pandemic, the medical treatment provided by Nurse Jones and other nurses, and his placement in segregation for nineteen days. Additionally, Broggin asserts claims of retaliation and denial of access to the courts in violation of his rights under the First Amendment.[3]

---

[2] Although Broggin attached the grievance records to his complaint, the factual contents of Major Enochs's responses cannot be accepted as true at this stage of the proceedings. See Goines v. Valley Comty. Servs. Bd., 822 F.3d 159, 168 (4th Cir. 2016) ("Treating the contents of such a document [prepared by or for the defendant] as true simply because it was attached to or relied upon in the complaint, even though the plaintiff relied on it for purposes other than truthfulness, would be contrary to the concept of notice pleading and would enable parties to hide behind untested, self-serving assertions.") (internal quotation marks and citation omitted).

[3] This construction of the complaint is consistent with the summary of claims provided in Broggin's response to the defendants' motion. See Pl.'s Resp. Opp'n Mot. Dismiss, ECF No. 33, at 1 (asserting that his complaint takes issue with the COVID-19 response protocols and "alleges defendants denied his constitutional rights of access to the courts, due process, freedom of speech, proper medical care, protection against cruel and unusual punishment, harmful risk and unsafe conditions to his health, deliberate indifference and being retaliated against while alleging unsanitary conditions"). Although the defendants' motion also seeks dismissal of any emotional distress claims under state law, Broggin does not mention any state tort claims in his own summary of the complaint or address the defendants' arguments for why such claims should be dismissed. Instead, he argues that all of the acts at issue were "conducted in violation of plaintiff's rights as secured and guaranteed under the . . . U.S. Constitution." Pl.'s Resp. Opp'n Mot. Dismiss at 1. Therefore, it does not appear that Broggin intended to assert any claims under state law, and the court will not construe the complaint to include such claims.

On August 30, 2021, the defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 27. The motion has been fully briefed and is ripe for disposition.

### III.    Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While a complaint does not need "detailed factual allegations," merely offering "labels and conclusions," "naked assertion[s] devoid of further factual enhancement," or "a formulaic recitation of the elements of a cause of action will not do." Id. (alteration in original) (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 555, 557).

Where, as here, a complaint was filed pro se, it must be construed liberally. King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016). Nonetheless, a pro se complaint "must still 'state a claim to relief that is plausible on its face.'" Sakyi v. Nationstar Mortg., LLC, 770 F. App'x 113, 113 (4th Cir 2019) (quoting Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014)).

### IV.    Discussion

Section 1983 imposes liability on any person who, under color of state law, deprives another person "of any rights, privileges, or immunities secured by the Constitution and laws"

of the United States. 42 U.S.C. § 1983. "An official can be held liable under § 1983 only 'where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Thomas v. City of Annapolis, 851 F. App'x 341, 347–48 (4th Cir. 2021) (quoting Wilcox v. Brown, 877 F.3d 161, 170 (4th Cir. 2017)); see also Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own actions, has violated the Constitution."). A local governmental entity, such as a regional jail authority, can be held liable under § 1983 only if the plaintiff shows that the entity's policy or custom was a "moving force" behind the constitutional violation. See Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981) (quoting Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). In other words, the entity's official policy or custom must have played a role in the alleged violation of federal law. Oklahoma City v. Tuttle, 471 U.S. 808, 817–18 (1985).

### A.    Conditions of confinement during the pandemic

Broggin first challenges the conditions and protocols in existence during the outbreak of the COVID-19 pandemic. He asserts that the defendants did "a poor job in controlling infections," that the conditions at the jail posed an "unreasonable risk to [his] health," and that the defendants acted with "deliberate indifference" to that risk. Compl. ¶¶ 96, 114.

Broggin cites to the Eighth Amendment in support of this claim of deliberate indifference. However, because Broggin is a pretrial detainee, the claim is governed by the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's prohibition against cruel and unusual punishment. Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). Nonetheless, because the due process rights of a pretrial detainee are "at least as

great" as the Eighth Amendment protections available to a convicted prisoner, id., the court

will evaluate Broggin's claim of deliberate indifference to the serious risks posed by COVID-

19 "under the same standard as a prisoner's claim of inadequate care under the Eighth

Amendment," Swain v. Junior, 961 F.3d 1276, 1285 (11th Cir. 2020); see also Mays v. Sprinkle,

992 F.3d 295, 300 (4th Cir. 2021) (noting that the Fourth Circuit has "traditionally looked to

Eighth Amendment precedents in considering a Fourteenth Amendment claim of deliberate

indifference to serious medical needs" and that "a pretrial detainee makes out a violation at

least where 'he shows deliberate indifference to serious medical needs' under cases interpreting

the Eighth Amendment") (quoting Martin, 849 F.2d at 870); see also Brown v. Harris, 240

F.3d 383, 388 (4th Cir. 2002) ("[W]e need not resolve whether Brown was a pretrial detainee

or a convicted prisoner because the standard in either case is the same—that is, whether a

government official has been 'deliberately indifferent to any [of] his serious medical needs.'")

(quoting Belcher, 898 F.2d at 34).

   A claim of deliberate indifference has both objective and subjective components.

Porter v. Clarke, 923 F.3d 348, 344 (4th Cir. 2019). "To satisfy the objective prong, a plaintiff

must demonstrate that the deprivation alleged [was], objectively, sufficiently serious." Id.

(internal quotation marks and citation omitted). More specifically, the plaintiff "must allege a

serious or significant physical injury resulting from the challenged conditions, or demonstrate

a substantial risk of serious harm resulting from [his] exposure to the challenged conditions."

De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and

citations omitted). To satisfy the subjective prong, a plaintiff must demonstrate that

correctional officials acted with deliberate indifference. Porter, 923 F.3d at 361. "Deliberate

indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 834 (1994). To establish deliberate indifference, a plaintiff must show that a correctional official "actually kn[ew] of and disregard[ed] an objectively serious condition, medical need, or risk of harm." De'Lonta, 330 F.3d at 634.

In the context of the COVID-19 pandemic, courts have held that "the objective prong is easily satisfied" given the risk of rapid transmission in the correctional setting and the potential for serious health effects resulting from the virus. Wilson v. Williams, 961 F.3d 829, 849 (6th Cir. 2020); see also Jones v. Sherman, No. 1:21-cv-01093, 2022 U.S. Dist. LEXIS 44156, at *16 (E.D. Cal. Mar. 11, 2022) (noting that "many courts have found that COVID-19 poses a substantial risk of harm, satisfying the objective prong"). Additionally, Broggin's complaint indicates that he was prescribed medication for high blood pressure, which has been identified by the Centers for Disease Control and Prevention as a condition that places an individual at a higher risk to develop serious complications from COVID-19. Ross v. Russell, No. 7:20-cv-00774, 2022 U.S. Dist. LEXIS 44567, at *28 (W.D. Va. Mar. 14, 2022) (citations omitted). Based on the foregoing, the court concludes that Broggin's allegations are sufficient to satisfy the objective component. Id.; see also Anders v. Russell, No. 7:21-cv-00030, 2022 U.S. Dist. LEXIS 42685, at 11 (W.D. Va. Mar. 10, 2022) (assuming that an inmate's allegations related to contracting COVID-19 at a local jail were sufficient to satisfy this prong).

The court agrees with the defendants, however, that Broggin has not pled sufficient facts to show that jail officials acted with deliberate indifference to a serious risk of harm. Broggin's complaint identifies multiple measures implemented to combat COVID-19. He

alleges that inmates and staff members were provided masks; that staff members cleaned his housing unit several times a week; that inmates had access to cleaning supplies to use on their own; that in-person visitation and library use was suspended; that inmates were required to quarantine for fourteen days upon entering the LADC; that staff members were required to have their temperatures taken by an infrared thermometer at the beginning of their shifts; that COVID-19 testing was performed on multiple occasions; and that jail officials housed positive inmates together and required them to quarantine for fourteen days. Several appellate courts have held that similar measures implemented by correctional facilities demonstrated that they had "responded reasonably to the risks" posed by COVID-19 and "therefore ha[d] not been deliberately indifferent." Wilson, 961 F.3d at 841; see also Swain, 961 F.3d at 1287–89 (holding that "the district court erred in concluding that the defendants' inability to ensure adequate social distancing constituted deliberate indifference" and that other measures taken to mitigate the spread of the virus, including those described by Broggin, demonstrated that the defendants did not act with deliberate indifference); Valentine v. Collier, 978 F.3d 154, 163–65 (5th Cir. 2020) (concluding that any argument that the correctional department evinced deliberate indifference was "dispelled by the affirmative steps it took to contain the virus," even though it "could have done more to protect vulnerable inmates"). Consistent with these decisions and others from the Western District of Virginia, the court concludes that Broggin's own allegations regarding the preventative measures implemented at the LADC do not support a finding of deliberate indifference. See Anders, 2022 U.S. Dist. LEXIS 42685, at *11–12 (holding that the plaintiff's "own allegations about COVID-19 measures" at a local jail "refute[d] any claim of deliberate indifference"); Ross, 2022 U.S. Dist. LEXIS 44567, at *35

11

(emphasizing, in dismissing a similar claim, that the plaintiff's "own allegations confirm that defendants took steps to limit transmission of the disease among inmates (such as lockdowns, quarantining, separating ill or positive inmates, the provision of masks, and extensive testing)").

In reaching this decision, the court recognizes that the measures implemented by jail officials did not prevent Broggin and hundreds of other inmates from contracting the virus. The fact that the measures "may have been unsuccessful," however, does not mean that "they were . . . unconstitutional." Valentine, 978 F.3d at 165. Nor is it enough for Broggin to suggest that the defendants "could have done more" to protect him and other inmates. Id. As indicated above, deliberate indifference is a "very high standard" that is not met by "mere negligence." Grayson v. Peed, 195 F.3d 692, 695–96 (4th Cir. 1999). The court is convinced that Broggin's allegations do not reflect deliberate indifference on the part of any of the defendants and, thus, do not rise to the level of a constitutional violation. Therefore, his complaint fails to a plausible claim under § 1983 related to the defendants' alleged failure to protect inmates from COVID-19.[4]

## B.    Inadequate medical treatment

Broggin also claims that Nurse Jones and other nurses acted with deliberate indifference to his serious medical needs. In his complaint, Broggin suggests that the nurses who examined him should have known that headaches can be a symptom of COVID-19 and

---

[4] It is unclear from the complaint whether Broggin intended to assert this particular claim against all four defendants or only certain defendants. Regardless, Broggin does not plausibly allege that any of the named officials acted with deliberate indifference to the serious risks posed by COVID-19. And in the absence of an underlying constitutional deprivation, the BRRJA is not subject to liability under § 1983. See, e.g., Jones v. Mullins Police Dep't, 355 F. App'x 742, 747 (4th Cir. 2009) (noting that "there can be no municipal liability in the absence of an underlying constitutional violation").

therefore immediately tested him for the virus. <u>See</u> Compl. ¶¶ 62–63. In response to the defendants' motion, Broggin contends that Nurse Jones "personally began [him] on high blood pressure medicine without advising him of alternatives or other options." Pl.'s Br. Opp'n Mot. Dismiss, ECF No. 33, at 8.

Even assuming that Broggin's medical needs were sufficiently serious to support a constitutional claim, he has not alleged facts from which the court could reasonably infer that Nurse Jones or any other nurse acted with deliberate indifference. "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" <u>Jackson v. Lightsey</u>, 775 F.3d 170, 178 (4th Cir. 2014) (quoting <u>Farmer</u>, 511 U.S. at 837). As noted above, this standard is not met by "mere negligence or even civil recklessness." <u>Id.</u> (citing <u>Estelle</u>, 429 U.S. at 10). To rise to the level of a constitutional violation, "it is not enough that an official <u>should</u> have known of a risk" to an inmate's health; rather, the official "must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." <u>Id.</u> Moreover, mere disagreements between an inmate and a medical provider do not suffice to establish deliberate indifference. <u>Id.</u>

Broggin's allegations clearly fail to meet this "exacting standard." <u>Id.</u> At most, Broggin suggest that Nurse Jones and other nurses mistakenly failed to recognize that his headaches may have been a symptom of COVID-19 and that they should have advised him of alternative treatment options before placing him on medication for high blood pressure. The Fourth Circuit has "consistently found such disagreements [between an inmate and a health care provider over the inmate's proper medical care] to fall short of showing deliberate

13

indifference." Id. Accordingly, the court agrees with the defendants that the complaint fails to state a claim of inadequate medical treatment under the Fourteenth Amendment against Nurse Jones or any other defendant.[5]

### C.      Placement in segregation

Broggin also asserts due process claims related to his placement in segregated confinement in the maximum-security unit for nineteen days. Broggin alleges that he was held in segregation for complaining to Major Enochs and other officers about the decision to move newly-infected inmates into Unit G.

It is well settled that "pretrial detainees possess a constitutional right 'to be free from punishment.'" Williamson v. Stirling, 912 F.3d 154, 173 (4th Cir. 2018) (quoting Bell v. Wolfish, 441 U.S. 520, 539 (1979)). A pretrial detainee who seeks to challenge individually-imposed restrictions typically pursues such challenge through a procedural due process claim. Id. at 174. "In some circumstances, however, the treatment of a pretrial detainee can be so disproportionate, gratuitous, or arbitrary that it becomes categorically prohibited punishment that will sustain a substantive due process claim." Id. at 175. Like the defendants, the court construes the complaint to assert both substantive and procedural due process claims stemming from Broggin's placement in segregation. The court will address each claim in turn.

---

[5] Broggin's allegations regarding the nurses' actions do not implicate Salmon, Major Enochs, or the BRRJA. In any event, in the absence of an underlying constitutional deprivation, Broggin has no viable claim of supervisory or municipal liability against the other defendants. See Jones, 355 F. App'x at 747; see also Doe v. Rosa, 664 F. App'x 301, 304 (4th Cir. 2016) ("There can be no supervisory liability when there is no underlying violation of the Constitution.") (citing Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 724 (4th Cir. 1991)).

1.      **Procedural due process**

Although "jail officials are entitled to impose nonpunitive restrictions on a pretrial detainee for disciplinary or administrative reasons," such restrictions, such as segregated confinement, "implicate a detainee's liberty interests." Tate v. Parks, 791 F. App'x 387, 390 (4th Cir. 2019) (citing Williamson, 912 F.3d at 174–176). Consequently, a pretrial detainee is "entitled to certain procedural protections" under the Due Process Clause. Id.; see also Gowen v. Enochs, No. 7:20-cv-00247, 2021 U.S. Dist. LEXIS 47330, at *9 (W.D. Va. Mar. 15, 2021) ("[A] pretrial detainee's placement in segregation implicates his protected liberty interests. Thus, segregation 'may not be imposed without due process'") (quoting Dilworth v. Adams, 841 F.3d 246, 253 (4th Cir. 2016)).

The procedural protections to which a pretrial detainee is entitled depends on whether a restriction is imposed for disciplinary or administrative purposes. Williamson, 912 F.3d at 175. "If the restriction imposed by jail officials is a disciplinary one—arising from a pretrial conduct's misconduct in custody—the detainee is entitled to notice of the alleged misconduct, a hearing, and a written explanation of the resulting decision." Id.; see also id. at 176 (explaining that "a jail official that seeks to discipline a pretrial detainee must provide the detainee with at least the procedural protections required by [Wolff v. McDonnell, 418 U.S. 539 (1974)]"). "If however, a restriction imposed by the jail officials is for administrative purposes—which include managerial and security needs—the level of process is diminished." Id. At a minimum, however, a pretrial detainee is entitled to the protections set forth by the Supreme Court in Hewitt v. Helms, 459 U.S. 460 (1983). Id. at 176–77. Specifically, jail officials must "provide the pretrial detainee with at least an 'informal, nonadversary review of the

15

information' supporting segregation, including submissions from the detainee, 'within a reasonable time after confining him to administrative segregation.'" Id. at 184 (quoting Hewitt, 459 U.S. at 472).

In this case, Broggin alleges that he was placed in "administrative segregation." Compl. ¶¶ 74, 76–77, 80. This description appears to be based on the fact that he was held in segregation with receiving any "institutional infraction." Id. ¶ 76. Other allegations, however, plausibly support Broggin's assertion that he was placed in segregation for a punitive reason— namely, to punish him for speaking out against the decision to move newly-infected inmates into his housing unit. See id. ¶ 80 (asserting that he was subjected to "disciplinary segregation treatment"); see also Compl. Ex. B, ECF No. 1-1 at 2 (alleging that he was being held in segregation without due process and in retaliation for voicing concerns about unsafe conditions).

In order to determine whether a particular restriction is disciplinary, rather than administrative, "courts must ask whether the restriction is expressly punitive, or whether a punitive intent may be inferred because the restriction is not reasonably related to a legitimate, nonpunitive purpose." Williamson, 912 F.3d at 181. Here, Broggin alleges that Major Enochs directed officers to "get [Broggin] out of [his] face" when Broggin attempted to "explain[] why he didn't want infected inmates to enter the unit." Compl. ¶ 73 (internal quotation marks omitted). Broggin further alleges that he was immediately moved to segregation in Unit M, and that when he asked why he was "being punished for nothing," he was "always" told that he "pissed the major off." Id. ¶ 80. These allegations, which must be accepted as true at this stage of the proceedings, allow the court to reasonably infer that Major Enochs was personally

16

involved in the decision to place Broggin in segregation and that he acted with the intent to punish Broggin for complaining about a decision that Broggin and other inmates and officers believed was unsafe.[6]

Additionally, for the nineteen days in which he was held in segregation, Broggin was only allowed to leave his cell twice a week for fifteen minutes to shower and clean the cell. He was unable to contact his family by phone, and he was denied access to outdoor exercise or recreation opportunities. Broggin's complaint plausibly alleges that these restrictions were "not reasonably related to a legitimate, nonpunitive purpose" and that they therefore support an inference of punitive intent on the part of Major Enochs.[7] Williamson, 912 F.3d at 181.

Finally, it is clear from the complaint that Broggin was not afforded the procedural protections to which a pretrial detainee is entitled when restrictions are imposed for disciplinary or punitive purposes.[8] See id. at 175. Broggin alleges that he did not receive notice

---

[6] In moving to dismiss the due process claims arising from Broggin's placement in segregation, the defendants repeatedly argue that Broggin "was transferred from G-Unit upon his own request." Defs.' Br. Supp. M. Dismiss, ECF No. 28, at 8; see also Defs.' Reply Br., ECF No. 36, at 6 (noting that the inmate request attached to the complaint indicated that Broggin "refused to be housed in the unhealthy environment and asked to be removed to finish his quarantine") (quoting Compl. Ex. A, ECF No. 1-1 at 1). This argument does not warrant dismissal of either claim under Rule 12(b)(6). While Broggin may have asked to be moved from Unit G rather than remaining there with the newly-infected inmates, the complaint in no way suggests that Broggin asked to be confined in segregation for nineteen days. See Pl.'s Resp. Opp'n, ECF No. 33, at 9 (emphasizing that "even if plaintiff asked to be removed, . . . he never asked to be punished and unable to call his family" or "denied recreation, chemicals, [and] toilet paper").

[7] At summary judgment, Major Enochs may be able to refute Broggin's allegations and establish an adequate justification for confining him in segregation. At this stage of the proceedings, however, the court is required to accept the factual allegations in the complaint as true and view them in the light most favorable to Broggin.

[8] Even if Broggin was placed in segregation for administrative reasons, rather than punitive ones, the complaint also plausibly alleges that he did not receive the level of process required under Hewitt. See Williamson, 912 F.3d at 184 ("We are therefore satisfied that a pretrial detainee—such as Williamson—has a liberty interest in avoiding the harsh conditions of solitary confinement, and that a detainee confined for administrative purposes is entitled to at least the procedural protections mandated by Hewitt.").

of any infraction, a "hearing to argue [his] confinement," or any other form of process. Id. ¶¶ 76, 99, 103; see also id. ¶ 113 (alleging that "no process was conducted and plaintiff remained in M Unit with very restricted options for 19 days").

For these reasons, the court concludes that Broggin has plausibly stated a procedural due process claim against Major Enochs. See Gowen, 2021 U.S. Dist. LEXIS 47330, at *15 (holding that a pretrial detainee "stated a due process claim against the defendants involved in the decision to place him in segregation" since his complaint "plausibly allege[d] that segregation was imposed for a punitive reason" and that he was not afforded the procedural requirements of Wolff); Grady v. Rogers, No. 3:20-cv-00601, 2022 U.S. Dist. LEXIS 10813, at *12 (W.D.N.C. Jan. 20, 2022) (holding that a pretrial detainee plausibly stated due process claims against two defendants who allegedly "placed the [p]laintiff on 30-day lockup without a hearing [or a] disciplinary charge").

### 2.    Substantive due process

To properly assess a substantive due process claim asserted by a pretrial detainee, the court "must determine whether he has been punished in contravention of Bell and the Due Process Clause." Williamson, 912 F.3d at 178. To prevail on such a claim, a pretrial detainee must show "that the challenged conditions were either (1) imposed with an express intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." Id. (internal quotation marks and citations omitted).

For the reasons set forth above, the complaint plausibly alleges that Broggin was held in segregation for a punitive reason. The explanation provided by officers—that Broggin

"pissed the major off"—suggests that Major Enochs expressly intended to punish Broggin. Additionally, Broggin's allegations regarding the restrictions to which he was subject for nineteen days plausibly suggest that "his conditions of confinement were not reasonably related to any legitimate, nonpunitive governmental objective." Id.; see also Dilworth, 841 F.3d at 252–53 (rejecting the argument that 85 days in disciplinary segregation, during which an inmate was confined to his cell for 23 hours each day, "might be so 'de minimis' that it cannot amount to punishment under Bell," and noting that "[o]ther courts have had no difficulty classifying this sort of disciplinary segregation as 'punishment'") (citing Kirk v. Boyles, No. 2:09-cv-00686, 2010 U.S. Dist. LEXIS 67890 (E.D. Cal. July 8, 2010) (report and recommendation) (rejecting the argument that three days of disciplinary confinement for a pretrial detainee was de minimis), adopted by, 2010 U.S. Dist. LEXIS 93416 (E.D. Cal. Sept. 8, 2010)). Thus, the complaint adequately states a substantive due process claim against Major Enochs.[9]

### 3.   Qualified immunity

Having determined that the complaint states plausible due process claims against Major Enochs, the court must address the defendants' argument that Major Enochs is entitled to qualified immunity. The doctrine of qualified immunity shields government officials "from

---

[9] Broggin does not allege that Salmon played any role in the decision to move him to segregation. Nor does he assert that any policy or custom played a role in the alleged violations of the Due Process Clause. Consequently, his complaint does not state a viable due process claim against Salmon or the BRRJA.

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a government official is protected by qualified immunity, the court considers (1) whether the plaintiff has plausibly alleged a violation of a statutory or constitutional right, and (2) whether the right was clearly established at the time of the conduct in question. See Pearson v. Callahan, 555 U.S. 223, 227 (2009). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Hope v. Peltzer, 536 U.S. 730, 739 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

For the reasons explained above, Broggin has alleged facts sufficient to show that Major Enochs placed him in segregated confinement with the intent to punish him, that his conditions of confinement in segregation were not reasonably related to a legitimate nonpunitive objective, and that he did not receive any procedural protections. Thus, Broggin has plausibly alleged violations of his rights to procedural and substantive due process.

To the extent the defendants argue that the rights at issue were not clearly established, their argument is foreclosed by the Fourth Circuit's decision in Williamson. In holding that "qualified immunity was inappropriately awarded" to the defendants on the plaintiff's substantive due process claim, the Fourth Circuit emphasized that "it has been clearly established since at least 1979 that pretrial detainees are not to be punished." Williamson, 912 F.3d at 187 (citing Bell, 441 U.S. at 535). Similarly, with respect to the plaintiff's procedural due process claim, the Fourth Circuit concluded that "no 'reasonable official' could have believed that a pretrial detainee could be disciplined absent the level of due process required

20

by <u>Wolff</u>." <u>Id.</u> at 188 (citation omitted). And, as already discussed, the complaint plausibly alleges that Broggin's placement in segregation constituted punishment within the meaning of <u>Bell</u> and that he did not receive the level of process required under <u>Wolff</u>. Thus, based on the allegations in the complaint, Major Enochs is not entitled to qualified immunity at this stage of the proceedings. <u>See</u> <u>Gowen</u>, 2021 U.S. Dist. LEXIS 47330, at *19 (concluding that the defendants were not entitled to qualified immunity at the Rule 12(b)(6) stage since there was "at least a question . . . as to whether [the pretrial detainee's] placement in segregation was disciplinary and, if so whether he was given all of the protections owed him under <u>Wolff</u>").

**D.    Retaliation**

In his next claim, Broggin asserts that Major Enochs retaliated against him for complaining about his conditions of confinement. In particular, Broggin alleges that Major Enochs placed him in segregation in Unit M because he complained about the decision to move newly-infected inmates into Unit G.

Although retaliation is not specifically referenced in the Constitution, it "is nonetheless actionable [under § 1983] because retaliatory actions may tend to chill individuals' exercise of constitutional rights." <u>Am. Civil Liberties Union v. Wicomico Cnty.</u>, 999 F.2d 780, 785 (4th Cir. 1993). In order to state a colorable retaliation claim under § 1983, an inmate must plausibly allege: (1) that he engaged in activity protected by the First Amendment; (2) that the defendant took some action that adversely affected his First Amendment rights; and (3) that there was a causal relationship between the inmate's protected activity and the defendant's conduct. <u>Martin v. Duffy</u>, 858 F.3d 239, 249 (4th Cir. 2017).

Broggin has satisfied the first element by alleging that he engaged in protected First Amendment activity. "The First Amendment protects the right 'to petition the Government for a redress of grievances," Kirby v. City of Elizabeth City, 388 F.3d 440, 448 (4th Cir. 2004), and "the Supreme Court has recognized that prisoners retain this constitutional right while they are incarcerated," Martin, 858 F.3d at 249 (citing Turner v. Safley, 482 U.S. 78, 84 (1987)). Consequently, while "the Constitution creates no entitlement to grievance procedures or access to any such procedure," Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994), "inmates possess a First Amendment right to be free from retaliation for filing a grievance," Booker v. S.C. Dep't of Corr., 855 F.3d 533, 546 (4th Cir. 2017). Likewise, inmates have a First Amendment right to be free from retaliation in response to verbal complaints to correctional officials. See id. at 542 (noting that Daye v. Rubenstein, 417 F. App'x 317, 319 (4th Cir. 2011), "misconstrued Adams as precluding an inmate from bringing a First Amendment claim alleging retaliation in response to a prisoner's verbal complaints to prison officials"); see also Patton v. Kimble, 717 F. App'x 271, 272 (4th Cir. 2018) (holding, in light of Booker, that the district court erred in concluding that an inmate's verbal complaint to a correctional officer's supervisor was not protected First Amendment activity). Thus, Broggin's verbal complaints to Major Enochs and other officers about the decision to move newly-infected inmates into Unit G satisfies the first element.

Broggin has also adequately alleged that Major Enochs "took some action that adversely affected his First Amendment rights." Martin, 858 F.3d at 249. For purposes of a First Amendment retaliation claim, a plaintiff suffers adverse action "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise

of First Amendment rights." <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 500 (4th Cir. 2005). Broggin's placement in segregation for nineteen days, during which he could only leave his cell for a total of thirty minutes per week, is sufficient to satisfy the adverse-action requirement. See <u>Martin</u>, 858 F.3d at 250 ("Certainly, 'placing an inmate in administrative segregation could deter a person of ordinary firmness from exercising his First Amendment rights.'") (quoting <u>Herron v. Harrison</u>, 203 F.3d 410, 416 (6th Cir. 2000)); <u>see also</u> <u>Brunson v. Nichols</u>, 875 F.3d 275, 277–78 (5th Cir. 2017) (holding that the three weeks that the plaintiff spent on "lockup" in a special housing unit after his submission of a grievance "would likely deter a person of ordinary firmness from exercising his constitutional rights"); <u>Hart v. Hairston</u>, 343 F.3d 762, 764 (5th Cir. 2003) (holding that "27 days of commissary and cell restrictions . . . constituted an 'adverse act'").

As to the third and final element of causation, Broggin has "sufficiently alleged that [the] retaliatory act of placing him in segregation 'was taken in response to the exercise of a constitutionally protected right.'" <u>Martin</u>, 858 F.3d at 250 (quoting <u>Adams</u>, 40 F.3d at 75). As indicated above, Broggin alleges that he was immediately placed in segregation after complaining to Major Enochs about the decision to move newly-infected inmates into Unit G. Broggin further alleges that other officers told him that he was being held in segregation because he "pissed off" Major Enochs. These allegations allow the court to reasonably infer that Broggin's verbal complaints were a motivating factor in Major Enochs's decision to take adverse action. See <u>id.</u> (holding that the plaintiff's allegation that an officer placed him in segregation "the day after he filed a grievance . . . , 'as an act of reprisal,' satisfie[d] the third

element necessary to state a retaliation claim"). Accordingly, the court concludes that Broggin has stated a plausible claim of retaliation against Major Enochs.[10]

The court further concludes that Major Enochs is not entitled to qualified immunity at this stage of the proceedings. In arguing that qualified immunity is appropriate, the defendants contend that it is not clearly established that verbal complaints to a correctional officer constitute protected activity and that they are "unaware of any binding authority on the subject." Defs.' Reply Br., ECF No. 36, at 9; see also Defs.' Br. Supp. Mot. Dismiss, ECF No. 28, at 13 (emphasizing that the defendants are unaware of any Fourth Circuit authority "addressing if and when verbal complaints become official grievances"). As indicated above, however, a careful reading of Booker clearly supports the conclusion that a verbal complaint or oral grievance to a correctional official constitutes protected activity under the First Amendment. The Fourth Circuit expressly noted that a prior unpublished opinion "misconstrued Adams to preclude an inmate from bringing a First Amendment claim alleging retaliation in response to his verbal complaints to prison officials" and ultimately concluded that "an inmate's First Amendment right to be free from retaliation for filing a grievance was clearly established." Booker, 855 F.3d at 542, 546 (emphasis added). Relying on Booker, the Fourth Circuit has since rejected the assertion that verbal complaints to a correctional officer are not protected activity:

> The district court . . . adopted the legal conclusion that, given the
> facts as pled, Patton did not state a cognizable First Amendment

---

[10] Broggin does not assert that Salmon was personally involved in the alleged retaliation. Nor does he allege that the retaliation was the result a policy or custom of the BRRJA. Consequently, his complaint does not state a viable retaliation claim against Salmon or the BRRJA.

> retaliation claim because the antecedent activity—Patton's verbal complaint to Kimble's supervisor regarding the initial seizure of his legal binder—was not protected First Amendment speech. But this conclusion runs contrary to <u>Booker</u>, in which we held that prisoners have a clearly established First Amendment right 'to file a prison grievance free from retaliation." 855 F.3d at 545. Accordingly, we vacate this portion of the district court's order and remand this case to the district court for further proceedings in light of <u>Booker</u>.

<u>Patton</u>, 717 F. App'x at 272.

Moreover, prior to the events giving rise to this action, at least four circuits had recognized in published decisions "that the form of the complaint . . . is of no constitutional significance" and that "even . . . verbal" complaints fall within the purview of protected activity under the First Amendment. <u>Entler v. Gregoire</u>, 872 F.3d 1031, 1039 (9th Cir. 2017) (citing <u>Jones v. Williams</u>, 791 F.3d 1023, 1035–36 (9th Cir. 2015) (holding that "summary judgment dismissing plaintiff's retaliation claim was improper because 'Jones's [verbal] complaints of discrimination to his supervisors and statements of intention to file suit were conduct protected by the First Amendment'")); <u>see also</u> <u>Maben v. Thelen</u>, 887 F.3d 252, 265 (6th Cir. 2018) (holding that an inmate engaged in protected activity by verbally complaining about the adequacy of his food); <u>Mack v. Warden Loretto FCI</u>, 839 F.3d 286, 299 (3d Cir. 2016) (concluding that an inmate's "oral grievance to [a correctional officer] regarding the anti-Muslim harassment he endured at work constitutes protected activity under the First Amendment"); <u>Pearson v. Welborn</u>, 471 F.3d 732, 741 (7th Cir. 2006) (rejecting the argument that an inmate's verbal complaints about prison conditions were unprotected by the First Amendment and noting that "[n]othing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form").

Thus, regardless of whether there was controlling authority directly on point, the right to be free from retaliation for verbal complaints or oral grievances was "clearly established based on a consensus of cases of persuasive authority from other jurisdictions." Booker, 855 F.3d at 543 (internal quotation marks and citations omitted); see also id. at 544 (concluding that the right to be free from retaliation for filing a grievance was clearly established in light of existing authority from other circuits); Pearson, 471 F.3d at 742 (rejecting the defendant's qualified immunity argument and holding that "a reasonable public official in [the defendant's] position would understand that retaliating against a prisoner on the basis of his [verbal] complaints about prison conditions is unlawful").

For these reasons, the court concludes that Broggin has adequately alleged the violation of a clearly established First Amendment right and that Major Enochs is not entitled to qualified immunity. Accordingly, the defendants' motion to dismiss is denied as to the retaliation claim against Major Enochs.

E.      Denial of access to courts

Broggin's final claim under § 1983 appears to be that he was denied access to the courts as a result of being held in segregation. In the complaint, Broggin alleges that he missed a bond hearing and a hearing to contest the forfeiture of a vehicle. See Compl. at ¶ 92. In response to the defendants' motion, Broggin argues that his allegations support a claim of denial of access to the courts. Pl.'s Resp. Opp'n Mot. Dismiss at 1. Although the defendants did not construe the complaint to assert such claim and therefore did not address it in their briefs, the court concludes that the claim is subject to dismissal pursuant to 28 U.S.C. § 1915A. See 28 U.S.C. § 1915A(b)(1) (providing that the court must dismiss "any portion of [a] complaint" in which

26

an inmate seeks redress from a governmental entity or an employee of a governmental entity if it "fails to state a claim upon which relief may be granted"); see also De'Lonta v. Johnson, 708 F.3d 520, 524 (4th Cir. 2013) (explaining that courts apply the standards for dismissal under Rule 12(b)(6) in determining whether any portion of a complaint is subject to dismissal under § 1915A for failure to state a claim).

To state a First Amendment claim for denial of access to the courts, a plaintiff must plead facts showing that he suffered an "actual injury" as a result of the denial of access. Lewis v. Casey, 518 U.S. 343, 351 (1996); see also Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) (en banc) (emphasizing that an inmate must "identify an actual injury" resulting from the denial of access and "cannot rely on conclusory allegations"). Specifically, the plaintiff "must identify a 'nonfrivolous,' 'arguable' underlying claim" that has been frustrated or impeded as a result of the defendants' actions. Christopher v. Harbury, 536 U.S. 403, 415 (2002) (quoting Lewis, 518 U.S. at 353 & n.3). In other words, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." Id.

Broggin's complaint does not identify an actual injury resulting from the alleged denial of access to the courts. Even assuming that Broggin "missed 2 important court dates" while in segregation, Compl. at ¶ 92, he does not allege, much less plausibly show, that a nonfrivolous, colorable claim or defense was frustrated or impeded as a result of the actions taken by Major Enochs or any other defendant. Because Broggin does not adequately allege that he suffered an actual injury as a result of missing either hearing, his complaint fails to state a claim for denial of access to the courts. See, e.g., Monroe v. Beard, 536 F.3d 198, 206 (3d

Cir. 2008) (holding that the plaintiffs failed to state a claim for denial of access to the courts where they "alleged that they lost the opportunity to pursue attacks of their convictions and civil rights claims but did not specify facts demonstrating that their claims were nonfrivolous").

## V.    Conclusion

For the reasons set forth herein, the defendants' motion to dismiss, ECF No. 27, is **GRANTED IN PART AND DENIED IN PART**. The case will proceed solely on the following claims under 42 U.S.C. § 1983 against Major Enochs: the procedural and substantive due process claims arising from Broggin's placement in segregation for nineteen days and his claim of retaliation in violation of the First Amendment. All other claims under § 1983 are **DISMISSED**. Because no claims remain against the BRRJA, Joshua Salmon, and Nurse Jones, they will be terminated as parties to this action. An appropriate order will be entered.

Entered: March 22, 2022

Michael F. Urbanski
Chief U.S. District Judge
2022.03.22 18:15:56
-04'00'

Michael F. Urbanski
Chief United States District Judge