## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **WARREN LEE BROGGIN, JR.,** | ) | |
| Plaintiff, | ) | **Case No. 7:21-cv-00180** |
| | ) | |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **MAJOR ENOCHS,** | ) | **Chief United States District Judge** |
| Defendant. | ) | |

### <u>MEMORANDUM OPINION</u>

Warren Lee Broggin, Jr., a federal inmate proceeding <u>pro se</u>, filed this civil action under 42 U.S.C. § 1983. At the time of the events alleged in the complaint, Broggin was being held as a pretrial detainee at the Lynchburg Adult Detention Center ("LADC"), where defendant William Enochs was the Site Administrator for the Blue Ridge Regional Jail Authority ("BRRJA"). In his remaining claims against Enochs, Broggin asserts that Enochs violated his rights under the Due Process Clause and the First Amendment by placing him in segregation for voicing complaints related to the facility's handling of a COVID-19 outbreak. Enochs has filed a motion for summary judgment to which Broggin has responded. For the reasons set forth below, the motion for summary judgment, ECF No. 50, is **DENIED**.

### I.    Factual Background

The following facts are primarily taken from Broggin's verified complaint, Enochs' sworn declaration, and Broggin's sworn response in opposition. <u>See</u> <u>Goodman v. Diggs</u>, 986 F.3d 493, 498 (4th Cir. 2021) ("[I]t is well established that 'a <u>verified</u> complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge.'") (quoting <u>Williams v. Griffin</u>, 952 F.2d 820, 823

(4th Cir. 1991)). The facts are either undisputed or presented in the light most favorable to

Broggin, the nonmoving party on summary judgment. See Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255 (1986).

From November 2020 to January 2021, Broggin was housed in Unit G at the LADC.

Compl., ECF No. 1, at ¶¶ 13, 60–61. Unit G is a minimum security unit that houses "low-level

offenders" in an open area with bunkbeds. Def.'s Decl., ECF No. 51-1, at ¶¶ 3, 7. While

housed in Unit G, Broggin was permitted to use the telephone from 8:00 a.m. to 11:00 p.m.

each day, and he could "receive video visits, watch television, access [the] law library, and

shower daily." Pl.'s Resp. Opp'n, ECF No. 55, at ¶ 37.

The LADC also has medium and maximum security units, as well as areas specifically

designated as segregation units. Def.'s Decl. ¶¶ 2, 4. The maximum security units, such as Unit

M, are "closed-cell units" in which each inmate is assigned a cell that locks. Id. ¶ 3. Inmates in

the maximum security units are typically allowed out of their cells for extended periods each

day for meals and recreational time. Id. ¶ 3.

In January 2021, the LADC experienced an outbreak of COVID-19. Id. ¶ 6. Because

the facility had testing capabilities by that time, "it was no longer the LADC policy to

quarantine an entire unit" when an inmate tested positive. Id. Instead, positive inmates in a

unit were required to quarantine, and inmates from the same unit that tested negative were

moved to a different location. Id.

On January 22, 2021, several inmates in Unit G, including Broggin, tested positive for

COVID-19. Id. ¶¶ 7–8. As a result, Broggin and the other positive inmates were required to

quarantine in Unit G. Id. ¶ 8. "The quarantine began on January 22, 2021 and was set to expire on February 4, 2021." Id.

On January 30, 2021, approximately 20 inmates in Unit E tested positive for the virus. Id. ¶ 10. Because of the logistical challenges associated with separating positive and negative inmates, Enochs and other officers "determined that the Unit E inmates that tested positive had to be quarantined in either Unit M or G," where other inmates had tested positive. Id. ¶ 11. Ultimately, the officers "decided it would be best to house the positive Unit E inmates with the positive Unit G inmates, because both Unit E and Unit G are minimum security classification units." Id.; see also id. ¶ 2 (asserting that "[i]nmates with different security classifications are not supposed to intermix").

An officer subsequently advised the inmates in Unit G that newly-infected inmates from Unit E were going to be moved to Unit G. Compl. ¶ 64. By that time, Broggin and other inmates in Unit G had been required to quarantine for nearly nine days, which resulted in two of Broggin's scheduled court appearances being cancelled. Id. ¶ 66. Broggin did not want to be exposed to the newly-infected inmates or have his quarantine period extended. Id. It is undisputed that Broggin shared his concerns with Enochs and that Broggin was subsequently moved to a locked cell in Unit M, where he was confined for roughly twenty-four hours per day.

The parties present conflicting accounts of their encounters and dispute whether Broggin chose to be subjected to more restrictive conditions of confinement rather than remaining in Unit G. According to Enochs, Broggin and other inmates in Unit G initially attempted to thwart the process of moving positive inmates from Unit E into their unit by

locking arms and forming a human chain that blocked the entrance to Unit G. Def.'s Decl.
¶ 12. In order to "diffuse the situation," officers decided that Enochs would sit at a desk
outside Unit G and meet one-on-one with Broggin and other inmates to address their
concerns. Id. ¶ 13. Enochs contends that Broggin did not believe him when he tried to alleviate
Broggin's concerns regarding the risk of reinfection and the possible need to restart the
quarantine process. Id. ¶ 16. When Enochs asked Broggin how he would like to resolve the
situation, Broggin purportedly indicated that he "wanted to be put in segregation." Id. Since
none of the inmates in the designated segregation units had tested positive for the virus,
Enochs informed Broggin that he could not be housed in either of those units. Id. Enochs
asserts that he then gave Broggin the following choice:

> I said he could either go back to Unit G or he could go to Unit
> M. I told him that he if he chose to go to Unit M, he would only
> be allowed out of his cell twice a week for a shower due to the
> incompatible security classification issue—Broggin was a
> minimum security classification inmate and Unit M inmates are
> classified as maximum security.

Id. ¶ 17. According to Enochs, Broggin and several other inmates "opted" to be moved to
Unit M, despite the fact that they would be subjected to more restrictive conditions of
confinement. Id. ¶ 18; see also id. ¶ 20 (describing the move as a "self-selected" decision).

Broggin, on the other hand, denies that he and other inmates in Unit G attempted to
block officers from moving positive inmates into the housing unit. See Pl.'s Resp. Opp'n ¶ 19
("There was never a point where plaintiff and others locked arms and blocked the door, as the
defendant falsely stated."). Broggin also denies being given a choice between remaining in Unit
G or moving to Unit M. See id. ¶ 26 ("Never did plaintiff have an option to be taken to M
Unit without any privileges or remain in G Unit with all privileges."); id. ¶ 28 ("Defendant

never gave plaintiff any options."). According to Broggin, he and other inmates in Unit G who complained of being housed with newly-infected inmates were told to gather their property and go to the desk where Enochs was waiting to speak to them. Id. ¶ 23. Broggin subsequently explained to Enochs "why he didn't want infected inmates to enter the unit." Compl. ¶ 72. He voiced concerns over "being further exposed" to the virus and having to miss scheduled court proceedings. Id.; see also Pl.'s Resp. Opp'n ¶ 24. In response, according to Broggin, Enochs "obviously became annoyed," "smirked," and "simply said, 'get him out of my face.'" Pl.'s Resp. Opp'n ¶¶ 24–25; Compl. ¶ 73. At that point, Broggin was placed in segregated confinement in a cell in Unit M. Compl. ¶ 74; see also BRRJA Individual Segregation/Detention Log, ECF No. 55-1 at 9 (indicating that Broggin was being held in "Admin. Seg" as of January 30, 2021).

After being moved to Unit M, Broggin "could not use the phone to advise family of his current situation or use the electronic tablet to fill out requests" for video visitation. Compl. ¶ 75. He was only allowed to leave his cell twice a week for fifteen minutes to take a shower and clean his cell, and he was denied access to outdoor exercise or recreation opportunities. Id. ¶¶ 76–77, 89; see also Pl.'s Resp. Opp'n ¶ 44 (asserting that the fifteen-minute intervals during which he was allowed to leave his cell in Unit M were "for showers only"). Although the cell was "filthy" when Broggin arrived, he had to wait 48 hours before he was allowed to clean it. Compl. ¶ 78. Additionally, Broggin only had access to half of a roll of toilet paper from January 20, 2021 to February 4, 2021, and he did not receive his prescribed medication. Id. ¶ 79. Broggin ultimately remained in segregated confinement in Unit M for a total of nineteen days before he was allowed to exit his cell like other inmates housed in that unit. See

id. ¶ 106 (alleging that Broggin was "released to M Unit after 19 days in a cell within M Unit");

see also Def.'s Decl. ¶ 26 (confirming that Broggin was not allowed to exit his cell in Unit M

with other inmates until February 17, 2021, at which time "the decision was made to override

Broggin's minimum security status, and re-classify him as a maximum security inmate").

According to Enochs, the delay in releasing Broggin from segregated confinement resulted

from several factors, including the fact that he needed to find separate housing options for

Broggin and other inmates who allegedly "caused the initial disturbance of preventing the

positive Unit E inmates from entering Unit G." Def.'s Decl. ¶¶ 21–23.

While being held in segregated confinement in Unit M, Broggin complained about the

restrictions imposed on him. He filed an inmate request form and a grievance asserting that

he was being held in segregation as a form of discipline without receiving due process. Compl.

Exs. A and B, ECF No. 1-1. In response, Enochs denied that Broggin was being disciplined

and asserted that the "transfer was at [Broggin's] request." Compl. Ex. B., ECF No. 1-1 at 3.

Enochs also indicated that Broggin could not be released in Unit M with maximum security

inmates and that he was unwilling to "punish[]" the other inmates by "tak[ing] away their

[recreation] time, in order to give it to [Broggin]." Compl. Ex. A, ECF No. 101 at 1.

## II.    Procedural History

On March 29, 2021, Broggin filed this civil action under 42 U.S.C. § 1983 against

Enochs and other defendants, asserting multiple violations of his constitutional rights. The

defendants moved to dismiss the claims against them under Federal Rule of Civil Procedure

12(b)(6). On March 23, 2022, the court issued an opinion and order granting in part and

denying in part the defendants' motion. The order provided that the case would proceed solely

on the following claims against Enochs: the procedural and substantive due process claims arising from Broggin's placement in segregated confinement for nineteen days and Broggin's claim of retaliation in violation of the First Amendment. See Order, ECF No. 41, at 1.

On July 5, 2022, Enochs moved for summary judgment on the remaining claims. ECF No. 50. Enochs argues that no constitutional violation occurred and that he is entitled to qualified immunity. Broggin has responded to the motion, and it is ripe for disposition.

## III.   Standard of Review

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Chapman v. Oakland Living Ctr., Inc., 48 F.4th 222, 228 (2022) (quoting Fed. R. Civ. P. 56(a)). When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party. Id.; see also Anderson, 477 U.S. at 255 (emphasizing that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). The court "may not weigh the evidence or make credibility determinations." Harris v. Pittman, 927 F.3d 266, 272 (4th Cir. 2019) (internal quotation marks and citations omitted). Instead, the court is tasked with determining "whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) (noting that "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie") (internal quotation marks and citation omitted).

## III.   Discussion

### A.   Due process claims

Broggin first asserts due process claims related to his placement in segregated confinement in the maximum-security unit for nineteen days. Broggin contends that he was subjected to significantly more restrictive conditions of confinement as a form of punishment for complaining to Major Enochs and other officers about the decision to move newly-infected inmates into Unit G.

Under the Due Process Clause of the Fifth and Fourteenth Amendments, federal and state pretrial detainees "possess a constitutional right 'to be free from punishment'" prior to an adjudication of guilt. Williamson v. Stirling, 912 F.3d 154, 173 & n.15 (4th Cir. 2018) (quoting Bell v. Wolfish, 441 U.S. 520, 535 (1979)). A pretrial detainee may assert a substantive due process challenge to his conditions of confinement "where they are so disproportionate or arbitrary that they are not related to legitimate penological objectives and amount to punishment." Tate v. Parks, 791 F. App'x 387, 390 (4th Cir. 2019) (citing Williamson, 912 F.3d at 174–76). "In addition, a pretrial detainee may assert a procedural due process violation based on the conditions of his pretrial confinement." Id. In this case, Broggin asserts both substantive and procedural due process claims stemming from his placement in segregated confinement in the maximum-security unit. The court will address each claim in turn.

### 1.    Substantive due process

To properly assess a substantive due process claim asserted by a pretrial detainee, the court "must determine whether he has been punished in contravention of Bell and the Due Process Clause." Williamson, 912 F.3d at 178. To prevail on such a claim, a pretrial detainee must establish "that the challenged conditions were either (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental

8

objective, in which case an intent to punish may be inferred." Id. (internal quotation marks and citations omitted). "If conditions are found to be arbitrary or excessive, it is permissible to 'infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.'" Stearns v. Inmate Servs. Corp., 957 F.3d 902, 907 (8th Cir. 2020) (quoting Bell, 441 U.S. at 539); see also Williamson, 912 F.3d at 185 (noting that a "rational and proportionate relationship [between a detainee's time in solitary confinement and a legitimate, nonpunitive governmental interest] does not exist if [a detainee's] conditions of confinement were 'arbitrary or purposeless'") (quoting Bell, 441 U.S. at 539). And if a genuine issue of material fact exists as to whether the challenged conditions were punitive, a substantive due process claim must be resolved by a jury. Williamson, 912 F.3d at 178.

In moving for summary judgment on this claim, Enochs argues that Broggin was not subjected to restrictive conditions of confinement as a form of punishment and that the restrictions instead resulted from his "own decision to transfer to Unit M." Def.'s Br. Supp. M. Summ. J., ECF No. 51, at 12, 14; see also id. at 12 (asserting that "Broggin self-selected to quarantine in Unit M" and that he "made this decision after being given the choice to either stay in Unit G, a minimum security unit, or move to Unit M, where he would only be let out of his cell twice a week to shower due to his incompatible classification"). As indicated above, however, Broggin affirmatively denies being given the option to remain in Unit G or move to Unit M, and he further denies the assertion that he chose to forego the privileges afforded in Unit G and instead be held in segregated confinement in Unit M. Broggin's sworn statements

are sufficient to create a genuine issue of material fact as to whether he voluntarily elected to be subjected to more restrictive housing conditions in Unit M.

Moreover, according to Broggin's sworn statements, Enochs "obviously became annoyed" when Broggin voiced concerns about the decision to move newly-infected inmates into Unit G. Pl.'s Resp. Opp'n ¶ 25. Enochs reportedly responded with a "smirk" and "simply said, 'get him out of my face.'" Id.; see also Compl. ¶ 73. Broggin further asserts that he was immediately moved to Unit M, where he was locked in a cell for roughly twenty-four hours per day, without being given the option to return to Unit G. Additionally, the record indicates that Enochs knew that Broggin was being subjected to restrictive conditions of confinement in Unit M and that Broggin nonetheless remained in segregated confinement for nineteen days. Although Enochs suggests that Broggin would have been released sooner if he had not needed to find separate housing units for Broggin and other inmates who "caused the initial disturbance of preventing the positive Unit E inmates from entering Unit G," Def.'s Decl. ¶ 21, Broggin categorically denies that he or any other inmates engaged in such misconduct.

Viewing the evidence in the light most favorable to Broggin, a jury could reasonably find that he was involuntarily moved to Unit M and held in segregated confinement after complaining about the decision to move newly-infected inmates into Unit G. A jury could also reasonably find that subjecting a pretrial detainee to significantly more restrictive conditions of confinement for voicing such complaints was "arbitrary or purposeless" and therefore amounted to punishment. Bell, 441 U.S. at 539. Because genuine issues of material fact exist as to whether the challenged conditions were punitive in nature, Enochs is not entitled to summary judgment on the merits of the substantive due process claim.

2.      **Procedural due process**

Broggin also claims that he was placed in segregated confinement in Unit M without receiving adequate procedural protections. "Jail officials may impose nonpunitive restrictions on a pretrial detainee for disciplinary or administrative reasons." Tate, 791 F. App'x at 390. However, because more restrictive housing conditions implicate a pretrial detainee's liberty interests, he is entitled to certain procedural protections under the Due Process Clause. Id. (citing Williamson, 912 F.3d at 174–76).

The level of process to which a pretrial detainee is entitled depends on whether restrictions are imposed for disciplinary or administrative purposes. Williamson, 912 F.3d at 175. If restrictions are disciplinary in nature, "the detainee is entitled to notice of the alleged misconduct, a hearing, and a written explanation of the resulting decision." Id.; see also id. at 176 (explaining that "a jail official that seeks to discipline a pretrial detainee must provide the detainee with at least the procedural protections required by [Wolff v. McDonnell, 418 U.S. 539 (1974)]"). "If, however, a restriction imposed by the jail officials is for administrative purposes—which includes managerial and security needs—the level of process to which the pretrial detainee is entitled is diminished." Id. at 175. At a minimum, however, a pretrial detainee is entitled to the protections set forth by the Supreme Court in Hewitt v. Helms, 459 U.S. 460 (1983). Id. at 176–77. Specifically, a jail official must "provide the pretrial detainee with at least an 'informal, nonadversary review of the information' supporting segregation, including submissions from the detainee, 'within a reasonable time after confining him to administrative segregation." Id. at 184 (quoting Hewitt, 459 U.S. at 472).

"To determine whether a particular restriction is disciplinary—rather than administrative—the courts again consult the framework of Bell, which guides that inquiry for procedural as well as substantive due process claims." Id. at 182. As explained above, the court "must ask whether the restriction is expressly punitive, or whether a punitive intent may be inferred because the restriction is not reasonably related to a legitimate, nonpunitive purpose." Id. "Accordingly, [if] the allegations underlying the due process claims are 'coextensive,' a determination that a restriction is 'punitive' may also confirm that the restriction was 'disciplinary.'" Id. at 185 n.25 (citing Stevenson v. Carroll, 495 F.3d 62, 69 (3d Cir. 2007)).

In moving for summary judgment on the procedural due process claim, Enochs first argues that he "did not impose any restrictions on Broggin" and that Broggin instead "self-selected to quarantine in Unit M." Def.'s Br. Supp. M. Summ. J. at 12. As indicated above, however, Broggin has provided a conflicting account of the parties' interactions, and Broggin's sworn statements are sufficient to create a triable issue of fact as to whether he voluntarily elected to be held in segregated confinement in Unit M. Thus, Enochs' first argument does not warrant summary judgment in his favor.

Enochs alternatively argues that he "met the Hewitt standard" of procedural due process by meeting with Broggin on January 30, 2021, and by responding to Broggin's written complaints regarding his conditions of confinement. Def.' Br. Supp. M Summ. J. at 13. As previously stated, the Hewitt standard applies if a pretrial detainee is placed in segregation for administrative purposes. Williamson, 912 F.3d at 175–77. A pretrial detainee is entitled to a heightened level of process if he is placed in segregation as a form of discipline. Id.

Here, the allegations underlying the procedural due process claim are "coextensive" with the allegations underlying the substantive due process claim. Williamson, 912 F.3d at 185 n.25. For the same reasons set forth above, the court concludes that genuine issues of material fact exist as to whether Broggin's restrictive conditions of confinement in Unit M were "self-selected" or instead amounted to discipline or punishment. Because the record indicates that Broggin did not receive all of the procedural protections to which a pretrial detainee is entitled when restrictions are imposed for disciplinary or punitive reasons, Enochs is not entitled to summary judgment on the merits of the procedural due process claim. See, e.g., Allah v. Milling, 982 F. Supp. 2d 172, 183 (D. Conn. 2013) (denying summary judgment with respect to a procedural due process claim since there was a genuine issue of material fact regarding whether the plaintiff's placement in administrative segregation constituted punishment and the defendants' argument relied "solely on the procedural due process to be afforded an inmate who is placed in administrative segregation . . . for non-punitive reasons").

### 3. Qualified immunity

The factual disputes identified above also preclude the grant of summary judgment based on qualified immunity. The doctrine of qualified immunity "protects government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When determining whether an official is protected by qualified immunity, the court must determine (1) whether the facts viewed in the plaintiff's favor make out a violation of his constitutional rights, and (2) whether the right at issue was clearly established

at the time. See Stanton v. Elliott, 25 F.4th 227, 233 (4th Cir. 2022) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

In this case, the court has already determined that the evidence presented by Broggin, when viewed in his favor, is sufficient to withstand summary judgment on his procedural and substantive due process claims. Thus, the court must decide whether the constitutional rights at issue were clearly established. A right is clearly established if it is "sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (alteration in the original) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).

At the time of Broggin's detention, it was clearly established that pretrial detainees may not be punished and that arbitrary or purposeless restrictions or conditions of confinement can constitute punishment when imposed on pretrial detainees. See Williamson, 912 F.3d at 187 (emphasizing that "it has been clearly established since at least 1979 that pretrial detainees are not to be punished") (citing Bell, 441 U.S. at 535); see also Bell, 441 U.S. at 539 ("[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment . . . ."). The law was also clearly established on the level of process owed to a pretrial detainee who was subjected to restrictive conditions of confinement for disciplinary reasons. See Williamson, 912 F.3d at 188 (concluding that "no 'reasonable official' could have believed that a pretrial detainee could be disciplined absent the level of process required by Wolff"). As already discussed, the record contains evidence that, when viewed in Broggin's favor, would allow a reasonable jury to find that the restrictive conditions of confinement to

14

which he was subjected in Unit M amounted to punishment within the meaning of <u>Bell</u> and that he did not receive the level of process required under <u>Wolff</u>. Accordingly, Enochs is not entitled to qualified immunity at this stage of the proceedings.

### B.  Retaliation claim

Broggin also claims that Enochs retaliated against him for complaining about his conditions of confinement. In particular, Broggin alleges that Enochs placed him in segregated confinement in Unit M because he complained about the decision to move newly-infected inmates to Unit G.

"It is well settled that '[t]he First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.'" <u>Camastro v. City of Wheeling</u>, 332 F. App'x 125, 127 (4th Cir. 2009) (quoting <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676, 685 (4th Cir. 2000)). The United States Court of Appeals for the Fourth Circuit has held that the framework set forth in <u>Mt. Healthy City School District Board of Education v. Doyle</u>, 429 U.S. 274 (1977), an employment case, applies to inmates' retaliation claims. <u>Martin v. Duffy</u> ("<u>Martin II</u>"), 977 F.3d 294, 304 (4th Cir. 2020). Under this framework, the plaintiff bears the burden of establishing a prima facie case of retaliation. <u>Id.</u> at 299. To make out a prima facie case, a plaintiff must establish three elements: (1) that he engaged in activity protected by the First Amendment; (2) that the defendant took an adverse action that would deter a person of ordinary firmness from exercising his rights; and (3) that there was a causal relationship between the plaintiff's protected activity and the defendant's conduct. <u>Martin v. Duffy</u>, ("<u>Martin I</u>"), 858 F.3d 239, 249–50 (4th Cir. 2017); <u>see also id.</u> at 250 (concluding that an

inmate made out a prima facie claim of retaliation by alleging "that he engaged in protected conduct by filing a grievance . . . ; that he was subsequently placed in segregation—a placement that might deter a person of ordinary firmness from filing grievances; and that his protected activity and [the] decision to place him in segregation were causally linked"). If a plaintiff establishes a prima face case of retaliation, the defendant may defeat the claim by proving that he would have taken the same action in the absence of the protected conduct. Martin II, 977 F.3d at 299 (citing Mt. Healthy, 429 U.S. at 283).

In moving for summary judgment on Broggin's claim of retaliation, Enochs argues that Broggin is unable to make out a prima facie case of retaliation. Although Enochs acknowledges that Broggin engaged in protected First Amendment activity by voicing complaints about the decision to move newly-infected inmates into Unit G, Enochs contends that Broggin is unable to satisfy the second and third elements of a retaliation claim. To support this contention, Enochs once again asserts that "Broggin chose to move to Unit M." Def.'s Br. Supp. M. Summ. J. at 16; see also id. (asserting that it was "Broggin's choice—not Lt. Enochs"). Based on this assertion, Enochs argues that Broggin is unable to establish that Enochs took any adverse action against him or that an adverse action occurred in response to Broggin's verbal complaints. See id.

Given the parties' conflicting versions of what transpired before Broggin was moved to Unit M, the court finds Enochs' argument unpersuasive. For the reasons discussed above, the court concludes that there is a genuine dispute of material fact as whether Broggin voluntarily chose to move to Unit M and be subjected to more restrictive conditions of confinement. Viewing the evidence in the light most favorable to Broggin, a reasonable jury

could find that Broggin suffered an adverse action by being placed in segregated confinement in Unit M. See Martin I, 858 F.3d at 250 ("Certainly, placing an inmate in administrative segregation could deter a person of ordinary firmness from exercising his First Amendment rights.") (internal quotation marks and citations omitted); see also Hart v. Hairston, 343 F.3d 762, 764 (5th Cir. 2003) (concluding that "27 days of commissary and cell restrictions . . . constituted an 'adverse act'"). Likewise, given the close temporal proximity between Broggin's complaints and his move to Unit M, a reasonable jury could find the requisite causal connection between the two events. See Penley v. McDowell Cty. Bd. of Educ., 876 F.3d 646, 656 (4th Cir. 2017) ("In retaliation cases, a causal connection may exist where the employer takes adverse employment action against an employee shortly after leaning of the protected activity."); see also Brown v. Gray, No. 21-3386, 2022 WL 961246, at *4 (6th Cir. Mar. 28, 2022) (emphasizing that an inmate's "transfer to administrative segregation and then to his new cell occurred almost immediately after he inquired about his legal mail, which is sufficient for a reasonable juror to find a causal connection between the two events"). Therefore, the court concludes that Enochs is not entitled to summary judgment on the merits of the retaliation claim.

The court further concludes that Enochs is not entitled to qualified immunity at this stage of the proceedings. With respect to the first prong, the facts viewed in Broggin's favor are sufficient to make out a violation of his First Amendment right. Thus, the only question that remains for the court to decide is "whether that violated right was clearly established at the time." Stanton, 25 F.4th at 233.

Prior to the events giving rise to this action, the Fourth Circuit held that "an inmate's First Amendment right to be free from retaliation for filing a grievance was clearly established." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 546 (2017). The Court also recognized, consistent with other circuits, that a verbal complaint or oral grievance to a correctional officer constitutes protected activity under the First Amendment. See id. at 542 (noting that a prior unpublished option "misconstrued" existing precedent "as precluding an inmate from bringing a First Amendment claim alleging retaliation in response to a prisoner's verbal complaints to prison officials"); see also Patton v. Kimble, 717 F. App'x 271, 272 (4th Cir. 2018) (holding, in light of Booker, that an inmate's verbal complaint to a correctional officer's supervisor was protected First Amendment speech); Maben v. Thelen, 887 F.3d 252, 265 (6th Cir. 2018) (collecting cases to support the conclusion that an inmate engaged in protected activity by verbally complaining about the adequacy of his food). Based on existing case law, a reasonable official in Enochs' position would have understood that it would be unlawful to subject an inmate to more restrictive conditions of confinement in retaliation for voicing complaints or concerns. Thus, at this stage of the proceedings, Enochs is not entitled to qualified immunity on the retaliation claim. See, e.g., Martin I, 858 F.3d at 249–51 (holding that the defendant was not entitled to qualified immunity on the inmate's claim that he was placed in segregation in retaliation for pursuing a grievance).

## IV.   Conclusion

For the reasons stated, Enochs has not shown "that there is no genuine dispute as to any material fact" or that he "is entitled to judgment as a matter of law" on any of the

remaining claims. Fed. R. Civ. P. 56(a). Accordingly, Enochs' motion for summary judgment, ECF No. 50, is **DENIED**. An appropriate order will be entered.

Entered: February 23, 2023

Michael F. Urbanski
Chief U.S. District Judge
2023.02.23 17:02:50
-05'00'

Michael F. Urbanski
Chief United States District Judge